## Jennings, Trustee, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued March 14, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-
FELD, PARKER, RHODES and HIRT, JJ.

*Douglass D. Storey,* of *Hause, Storey & Lick,* with
him *Leo W. White,* for appellant.

*Paul D. Larimer,* with him *Harry M. Showalter,
Thomas C. Evans, Harry K. Daugherty, George W.
Keitel,* Assistant Deputy Attorney General and *Claude
T. Reno,* Attorney General, for appellees.

OPINION BY KELLER, P. J., July 19, 1940:

Prior to September 23, 1937, the Wilkes-Barre & Eastern Railroad Company, a Pennsylvania corporation, operated about sixty-two miles of railroad, running from Stroudsburg, Pa. to Plains, Pa. On that date it filed an application with the Interstate Commerce Commission and another with the Pennsylvania Public Utility Commission, for permission to abandon the part of its line between Stroudsburg and Suscon, Pa.—a distance of about fifty-four miles.

On September 25, 1937, Wilkes-Barre & Eastern filed in the United States District Court for the Middle District of Pennsylvania (No. 9660) a petition for reorganization under Section 77 of the Bankruptcy Act (11 U. S. C. A. 205). That court assumed jurisdiction and appointed Joseph P. Jennings trustee. He intervened as trustee in the two abandonment proceedings in April, 1938, and is the appellant herein. Following the filing of protests, a joint hearing on the proposed abandonment was held before the two commissions. The Interstate Commerce Commission granted permission to abandon, in a certificate of public convenience and necessity dated January 17, 1939, effective after forty days from its date. The Pennsylvania Public Utility Commission by an order dated February 20, 1939 also granted permission for such abandonment and issued its certificate of public convenience (64a, 65a). No qualifications or conditions were attached to either certificate and no affirmative duties in connection with the abandonment were imposed on the applicant in either of them.

The District Court, after hearing, also approved the abandonment, on March 21, 1939. The line from Stroudsburg to Suscon was abandoned, and has not been used since March 26, 1939.

On January 17, 1939, the Public Utility Commission of its own motion issued a declaration, setting forth that it had information that three overhead crossings,

one undergrade crossing and twenty-three grade crossings were involved in the fifty-four miles of line abandoned, and therein instituted an "inquiry and investigation", in which the appellant herein, the Pennsylvania Department of Highways, and various counties, townships and boroughs were named respondents, to decide whether or not the respondents "should remove, at their own cost and expense, the rails, ties, bridges and other facilities from the aforesaid crossings over public streets, highways and roads, and restore the surface of such crossings to a condition comparable with that of the adjoining highway surfaces." The appellant had no knowledge of this proceeding until April 27, 1939 —a month after the actual abandonment of said line— when notice of a hearing set for May 10, 1939, was received by him (13a). This notice (1a-3a) contained a recital of the permission by the Interstate Commerce Commission and the Public Utility Commission to abandon the part of the road involved here.

On May 8, 1939, the appellant moved to dismiss the proceedings as to him on the ground that the commission had no jurisdiction over Wilkes-Barre & Eastern or over its property, such jurisdiction being solely in the district court. Hearing was held on May 10, 1939, at which time counsel for the commission stated that the proceeding was under section 409 of the Public Utility Law of May 28, 1937, P. L. 1053, as amended by Act of Special Session of September 28, 1938, P. L. 44.

In an order dated December 4, 1939, the Public Utility Commission denied, on the authority of *Palmer v. Massachusetts*, 308 U. S. 79, the appellant's motion to dismiss, and ordered appellant, at his expense, to remove the rails, ties, bridges, etc., at thirty-two highway crossings and to repave the highways at those points, etc., by July 1, 1940, and to pay any damages due property owners as a result thereof.

The appellant relies in this court chiefly on two legal

propositions: (1) That the commission is without jurisdiction under section 409 of the Public Utility Law to order appellant to perform these duties, after the abandonment of the railroad—that its control over grade crossings is limited to what may be termed 'live' crossings, where there is a hazard to persons traveling on streets, roads, highways, etc., by the movement of trains or cars across them; (2) that the exclusive jurisdiction to order or require appellant to perform these duties, or cause them to be done, rests in the District Court of the United States having jurisdiction of the reorganization of the railroad—the court which appointed appellant trustee and whose agent and officer he is.

We will consider them in that order.

(1)  Under section 202(d) of the Public Utility Law, supra (66 PS §1122), the utility had to obtain from the commission a certificate of public convenience before it could abandon any part of its railroad.  This was secured, and it was not until after this was granted and fifty-four miles of the line had been abandoned, that the appellant received notice that the commission would attempt to make him remove the substructure and superstructure of the bridges located within the right of way of the highways, and the rails, etc., from the bed of the highways which they crossed, and repave, etc.  The commission asserts that power to do this is found in section 409 of the act, which provides in part:

"Section 409.  Construction, Improvement, Protection, and Abolition of Crossings; Recording.

"(a)  No public utility, *engaged in the transportation of passengers or property,* shall, without prior order of the commission, construct its facilities across the facilities of any other *such* public utility or cross any highway at grade or above or below grade, or at the same or different levels; and no highway, without like order, shall be so constructed across the facilities of any *such* public utility, and, without like order, no such

574

crossing heretofore or hereafter constructed shall be altered, relocated or abolished ......

"(c) Upon its own motion or upon complaint, the commission shall have exclusive power after hearing, upon notice to all parties in interest, including the owners of adjacent property, to order any such crossing heretofore or hereafter constructed to be relocated or altered, or to be abolished upon such reasonable terms and conditions as shall be prescribed by the commission. In determining the plans and specifications for any such crossing, the commission may lay out, establish, and open such new highways as, in its opinion, may be necessary to connect such crossing with any existing highways, or make such crossing more available to public use; and may abandon or vacate such highways or portions of highways as, in the opinion of the commission, may be rendered unnecessary for public use by the construction, relocation, or abandonment of any of such crossings. The commission may order the work of construction, relocation, alteration, protection, or abolition of any crossing aforesaid to be performed in whole or in part by any public utility or municipal corporation concerned or by the Commonwealth."

It is clear from the heading of the section and its wording, restricted as above in paragraph (a)—"No public utility *engaged in the transportation of passengers or property,* shall, without the prior order of the commission," etc.—that it concerns only crossings where the line of an *operating* railroad crosses a highway or the line of another *operating* railroad, and not, as here, where a highway is crossed by an unused or abandoned right of way. This is borne out by an examination of the cases decided under the similar section (§12 of Article V) in the Public Service Company Law of July 26, 1913, P. L. 1374, as amended by Act of July 17, 1917, P. L. 1025. None of the cases under the pertinent part of that section (66 PS §571) dealt with "crossings" of a highway by a railroad's abandoned right of way,

over which no trains or cars were operated. See Notes of Decisions to 66 PS §571 and Supplement, and Shepard's Pennsylvania Supreme Court Citations (Pamphlet Laws 1913, p. 1374, Art. V, sec. 12). The cases under the new act, section 409 (*Somerset County v. P. U. C.*, 132 Pa. Superior Ct. 585, 1 A. 2d 806; *Conshohocken Borough v. P. U. C.*, 135 Pa. Superior Ct. 295, 5 A. 2d 590) are similarly restricted. In *Erie v. P. S. C.*, 74 Pa. Superior Ct. 265, cited by the commission to show its exclusive jurisdiction over the maintenance and abolition of grade crossings, this court upheld this contention, as against the claim of the city that the commission did not have authority to abolish grade crossings by closing streets, because the city had control over its streets. In reaching this conclusion, we said (pp. 268-269), "Necessarily when crossings are abolished, the part of the street which crosses the railroad tracks can no longer be part of a thoroughfare." It is equally true that if one of the two streams of traffic is discontinued and abandoned there is no longer a "crossing", within the contemplation of the statute.

In the final order of the commission it is said, (pp. 72-a-73-a):

"Testimony submitted at the hearing held May 10, 1939, shows that on the portion of the line of railroad *to be abandoned* [it had already been abandoned] there are 28 crossings at grade, three crossings above grade, and one crossing below grade; that previous to the abandonment of the line of railroad, the maintenance of the above mentioned crossings was an obligation of the railroad company; that in the event the rails, ties and facilities of the railroad company are permitted to remain in the highways at the crossings at grade, and the substructure and superstructure of the bridges at the crossing above grade and below grade are not removed from within the limits of the highway, a dangerous condition affecting public safety *will ensue*." (Italics supplied).

In none of the cases referred to by us above, was the danger affecting the public safety, as found by the commission, merely a danger that might "ensue" because of possible future deterioration of the *pavement* or surface of the highway and failure to repair it. In all of them, the danger arose from the cross stream of traffic at grade, or because of *presently* inadequate facilities for carrying highway traffic over or under the utility's lines. In *Delaware & Hudson Co. v. P. S. C.,* 96 Pa. Superior Ct. 169, the abolition of a grade crossing was involved. Thirty-five per cent of the cost was put on the company, which had operated four trains a day over the crossing at the beginning of the proceedings. After the order was handed down, the company asked for a re-opening of the record to take additional testimony, on the ground that it had abandoned (with consent of the Interstate Commerce Commission) all passenger traffic over these tracks; that only one train a day was then operated; that this number would probably be further reduced and that the public could be protected by stopping these few trains and sending a flagman ahead. The commission refused a re-hearing and, on appeal, we reversed and held, in an opinion by Judge GAWTHROP, (p. 174) that the elimination of the grade crossings would not be necessary if the public could be protected in some other way. See also *Erie R. R. Co. v. P. S. C.,* 77 Pa. Superior Ct. 196, 208; *West Penn Rwys. Co. v. P. U. C.,* 135 Pa. Superior Ct. 89, 98, 99, 4 A. 2d 545; and the very full discussion of 'grade crossings' in Bouvier's Law Dictionary, Rawle's 3d Revision, pp. 1369-1371, in which it is made clear that the term applies to the crossing of a highway, etc., by an operating railroad, not by an abandoned track. The hazards intended to be dealt with by section 409, supra, were those created by the movements of trains and cars over the tracks crossing the highway, not the mere presence on the highway of abandoned or 'dead'

rails. See *Pittsburgh, F. W. & C. Ry. Co. v. Dunn,* 56 Pa. 280.

The commission had the power, in granting the certificate of public convenience for abandonment under section 202(d), to attach reasonable conditions to its consent, so long as they were proper under the company's franchise or under contracts previously entered into by it with the various municipal authorities: Section 203(a); *West Penn Rwys. Co. v. P. U. C.,* supra, at page 96. This it did not attempt to do.

As to the part of the order which directs the appellant to pay damages to owners of property affected by the changes, the same reasoning applies. It is also the case, here, that in the order served on the appellant the commission gave him no notice that it would attempt to impose liability on him for such damages; and no hearing was had fixing or determining their amount: *Erie R. R. Co. v. P. S. C.,* 271 Pa. 409, 415, 114 A. 357.

The certificate of public convenience issued by the commission in this case was not to permit the applicant to begin the rendering of service, etc., but to abandon part of its service, rights, etc.; hence, differing from the former, (see *Day v. P. S. C.,* 312 Pa. 381, 384, 167 A. 565), when actually carried into effect, it could not be rescinded by the commission.

(2) The foregoing is determinative of the case; but we are also of opinion that in the circumstances here present, involving a railroad in re-organization under section 77 of the Bankruptcy Act, the commission was without jurisdiction to require the trustee appointed by the Federal district court to carry into effect an order having no relation to the operation of the railroad or the furnishing of service, etc., but confined to matters arising subsequent to the abandonment of part of its line, which had been unconditionally authorized by the Federal and State commissions. Such matters, in our judgment, are for the consideration and decision of the court having jurisdiction of the re-organization

of the railroad under the Bankruptcy Act, and while we have no doubt that, upon the matter being presented to it, that court will see that the interests of the public using the highways crossed by this abandoned right of way are protected as far as may be legally required of its agent, the commission cannot force its hand nor usurp its jurisdiction and require the court's officer to perform acts having that end in view, under penalty of fine and imprisonment on conviction of misdemeanor (secs. 1301 and 1302), if he fails to obey and carry into effect its order.

This is not an action for a money judgment arising out of a claim for damages caused by the operation of the railroad, either before or after the appointment of a trustee in re-organization proceedings. In such cases a state court may, by express authority of section 77(j), assume jurisdiction and proceed to the entry of judgment, leaving, however, its ultimate recovery or payment within the control of the Federal Court having jurisdiction of the re-organization proceedings. The order appealed from is one requiring the court's agent to do certain specific things which have no relation to the operation of the railroad or the furnishing of service; but a refusal to do them, nevertheless, may subject him to fine and imprisonment.

The case of *Palmer v. Massachusetts,* 308 U. S. 79 (FRANKFURTER, J.), relied upon by the commission has no application here. In that case, the railroad went into re-organization in 1935. In 1937, the trustees applied to the Massachusetts Department of Public Utilities for leave to abandon 88 local passenger stations. While this application was pending, creditors of the debtor asked the district court to allow abandonment of the same services, and the trustees joined in the petition. The district court allowed the abandonment over the opposition of the Department. The Circuit Court of Appeals (2d Circuit) reversed, and the Supreme Court of the United States affirmed the judgment

of that court, on the ground that the department or commission must act favorably on the application before the district court had jurisdiction to order the abandonment. The Supreme Court drew an analogy to abandonment of interstate facilities for which the approval of the Interstate Commerce Commission is necessary (secs. 77(c) (6) and 77(o), 11 U. S. C. A. §205). The rationale is that such abandonment is a matter of vital importance to the local users of the utility's service and hence the State authority which represents them must consent to the abandonment before the district court can order it. It was concerned with an operating railroad, which desired to discontinue certain passenger stations and eliminate local service to and from them, but would continue to operate its lines through and past those points. The road was not to be abandoned—only the local service; and as Mr. Justice FRANKFURTER said: "The dependence of local communities on local railroad services has for decades placed control over their curtailment within the regulatory authorities of the states" (p. 84). The case is not applicable here, for our state authority gave its unconditional assent to the absolute abandonment of these fifty-four miles of railroad.

The principles enunciated by Mr. Justice FRANKFURTER are implicit in section 77, (providing for railroad re-organization), added to the Bankruptcy Act on March 3, 1933 and revised and amended by the Act of August 27, 1935, 11 U. S. C. A. sec. 205. See 8 C. J. S. Bankruptcy, sec. 881 et seq. p. 1877. The scheme involves close co-operation between the district court and the Interstate Commerce Commission, and before the court may order the abandonment of interstate service, the approval of that commission must be obtained (sec. 77(o) ); and for intrastate service, the approval of the state utility commission, *Palmer v. Mass.*, supra. So, too, the provisions relative to the operation of the railroad, where the lessee, in the re-organization pro-

ceedings, rejects the lease (Sec. 77(c) (6) ), recognize these principles. See *Warren v. Palmer,* 310 U. S. 132, 60 Sup. Ct. 865, 867-8 (STONE, J.) ; *Webster & Atlas Nat. Bk. v. Palmer,* 111 Fed. 2d 215 (2d Circ. CLARK, J). But they are not determinative here, as the consent of the Public Utility Commission to the abandonment of the portion of the line here involved had been obtained before the district court ordered its abandonment.

The following paragraphs, inter alia, of section 77 deal with the jurisdiction of the district court in such reorganization proceedings:

"77(a) ...... If the petition [for re-organization] is so approved, the court in which such order is entered shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the debtor and its property wherever located, and shall have and may exercise in addition to the powers conferred by this section all the powers, not inconsistent with this section, which a Federal court would have had if it had appointed a receiver in equity of the property of the debtor for any purpose. Process of the court shall extend to and be valid when served in any judicial district ......

"77(j) In addition to the provisions of section 29 of this title for the staying of *pending* suits against the debtor, the judge may enjoin or stay the commencement or continuation of suits against the debtor until after final decree; and may, upon notice and for cause shown, enjoin or stay the commencement or continuance of any judicial proceeding to enforce any lien upon the estate until after final decree: *Provided,* That suits or claims for damages caused by the operation of trains, busses, or other means of transportation may be filed and prosecuted to judgment in any court of competent jurisdiction and any order staying the prosecution of any such cause of action or appeal shall be vacated ......

"77(1) In proceedings under this section and con-

sistent with the provisions thereof, the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and of all persons with respect to the debtor and its property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was filed."

It will be noted that the proviso in Section 77(j), supra, expressly authorizes the filing of suits for damages, caused by the operation of trains, and their prosecution to judgment in any court of competent jurisdiction. Without such express authority, under the broad language of section 77(a), supra, the right to sue and prosecute such claims to judgment in a state court would not exist. The effect of such a judgment is to convert the plaintiff's claim into a liquidated claim, the judgment not to be executory against defendant's property and assets and only to be enforceable in and under the re-organization proceeding. *Bourgeois v. New Orleans T. & M. Ry. Co.*, 193 So. 394 (Ct. of Appeal of La. 1940). See also *Foust v. Munson S. S. Lines*, 299 U. S. 77, 82, a proceeding under section 77B.

For the foregoing reasons, the order must be reversed.

Order reversed, the costs to be paid by the Commission and the Department of Highways, intervening appellee, equally.