## Allegheny County Port Authority, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued September 29, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused February 19, 1968.

*Edward L. Springer*, with him *Louis M. Tarasi, Jr.*, and *Burgwin, Ruffin, Perry, Pohl & Springer*, for appellant.

*Anthony L. Marino*, Assistant Counsel, with him *Joseph C. Bruno*, Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*Thomas S. White*, Assistant City Solicitor, and *David Stahl*, City Solicitor, for intervening appellee.

*Donald A. Brinkworth*, for intervening appellee.

*Gilbert E. Morcroft*, for intervening appellee.

*William D. Sutton*, with him *Harry H. Frank*, and *Thorp, Reed & Armstrong*, and *McNees, Wallace & Nurick*, for intervening appellee.

OPINION BY MR. JUSTICE O'BRIEN, November 28, 1967:

The Public Utility Commission, on October 24, 1966, issued an order relieving Pittsburgh Railways Company of any responsibility to maintain a crossing located in Allegheny County, known generally as the "Black's Bridge" crossing and placing that responsibility on the Port Authority of Allegheny County.

That order was the culmination of a lengthy proceeding which commenced, insofar as the Authority is concerned, when the Commission, in February of 1964, joined the Authority as a respondent in a highway-rail crossing proceedings involving Black's Bridge. From that time to the present, the Authority has been involved in a complex of litigation involving three appeals to the Superior Court. The Authority first appealed the refusal of the Commission to dismiss it as a party respondent. The Superior Court quashed the appeal as being from an interlocutory order, inasmuch as no assessment had as yet been made against the Authority. The second appeal was from the Commission's order assessing the Authority and Railways, jointly and severally, 30% of the costs incident to the construction of a new bridge to replace the existing one. The Superior Court, in *Allegheny Co. Port Auth. v. Pa. P.U.C.*, 207 Pa. Superior Ct. 299, 217 A. 2d 810 (1966), remanded the record to the Commission for further proceedings upon the ground that the record showed no basis for assessing the Authority. Before the Commission could take any additional evidence relative to the assessment of costs in the construction of a new bridge, Railways filed a petition requesting that the maintenance responsibility for the existing bridge be transferred from it to the Authority. The Commission held a consolidated hearing on Railways' petition and the issue remanded to it by the Superior Court and issued the order here in dispute. The Superior Court affirmed the Commission's order and we granted allocatur.

Throughout the course of this litigation, in this phase as well as its earlier phases, the Authority has consistently taken the position that it has no concern with the Black's Bridge crossing, and, accordingly, is not subject to the Commission's statutory assessment powers in regard thereto under §§409-412 of the Public

566

Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 P.S. §§1179-1182.

The Port Authority bases its argument upon the following considerations: The Port Authority was created by the Second Class County Port Authority Act, Act of April 6, 1956, P. L. (1955) 1414, 55 P.S. §551 et seq. In 1959, the General Assembly amended the Port Authority Act, to authorize the Authority to establish an integrated system of mass transportation for passengers within Allegheny County and portions of other counties adjacent thereto, which together constitute its service area.

Pursuant to the Second Class County Port Authority Act, the Board of County Commissioners of Allegheny County, on April 23, 1963, approved the Port Authority's Plan for an integrated system of mass transportation. Thereafter, on February 26, 1964, the Authority condemned Railways' transportation system, thereby acquiring Railways' property, real and personal, "useful for the transportation of passengers for hire".

It is the Authority's contention that the Black's Bridge crossing was not a part of Railways' transportation system at the time of such condemnation. It therefore concludes that it did not acquire Black's Bridge and necessarily has no legal concern with such crossing and cannot be subjected to any assessments in connection therewith under §§409-412 of the Public Utility Law.

In support of this conclusion, the Authority relies upon the following facts, which are a matter of record in this proceeding: Black's Bridge and the rail facilities connected therewith were a part of Railways' West End system of street-railway routes, which was abandoned by Railways pursuant to the Commission's order of January 16, 1961. Since the Port Authority could acquire by condemnation under the Port Author-

ity Act only property "useful for the transportation of passengers for hire", it contends that it did not acquire any interest in a railway crossing which had been part of a system of street-railway routes which had been officially abandoned several years before the Authority entered into the transportation business.

In further support of its lack of concern with the Black's Bridge crossing, the Authority points out that the Commission had determined more than two years before the Authority condemned Railways' transportation system that Black's Bridge had outlived its usefulness and had to be replaced by a new bridge. In further showing its lack of interest in Black's Bridge, the Authority states that it has never operated any form of transportation over the bridge and that the Commission has no authority to require it to do so. In this regard, the Port Authority notes that §3 of the Port Authority Act places in it the power to determine by itself, exclusively, the facilities to be operated by it, and the services to be available to the public, and that the same section also grants to it the right to use any public road, street, way, highway, bridge, or tunnel for the operation of its transportation system within its service area.

In view of the foregoing considerations, we must agree with the Authority that the Commission has no power to impose any assessments upon it in connection with the construction, relocation, alteration, protection or abolition of the Black's Bridge crossing.

The Public Utility Commission's powers in all cases are statutory. Its authority to allocate costs in a highway-rail crossing proceedings must be found within §§409-412, inclusive, of the Public Utility Law. This court, in *Delaware River Port Auth. v. Pa. P.U.C.*, 393 Pa. 639, 643, 145 A. 2d 172 (1958), in commenting upon the Public Utility Commission's assessment powers in highway-rail crossing cases, stated: "Initially,

the power of the Commission to allocate costs in high-way-rail crossing situations must be considered. In so doing we must bear in mind that *the Commission's authority must either arise from the express words of the Statute or by strong and necessary implication therefrom.* As President Judge RHODES aptly said in West Penn Railways Company v. Pennsylvania Public Utility Commission, 135 Pa. Superior Ct. 89, 99, 4 A. 2d 545: 'The area of administrative activity is not boundless; the commission's power is statutory; and the legislative grant of power to act in any particular case must be clear (Day v. Public Service Commission et al., 312 Pa. 381, 384, 167 A. 565).'

"The extent of the Commission's authority and jurisdiction to act must be found within Sections 409-412, inclusive, of the Public Utility Code, supra." (Emphasis in original)

Section 411 of the Public Utility Law limits the Commission's power of assessment in highway-rail crossing cases to those public utilities, municipal corporations, or agencies of the Commonwealth which are *concerned* with the highway-rail crossing under consideration. We can see no basis for concluding that the Authority has any concern whatsoever in the Black's Bridge crossing. Railways had ceased operating railway service over Black's Bridge prior to the time that the Authority acquired Railways' transportation system. The Authority has never used the bridge for any transportation purpose.

We believe that the law has been firmly established in this Commonwealth that a transportation utility has no concern with any crossing for purposes of assessment under §411 of the Public Utility Law, where it does not have a rail facility situated at such crossing. *Jennings v. Pa. P. U.C.,* 140 Pa. Superior Ct. 569, 14 A. 2d 882 (1940) ; *Pa. R.R. Co. v. Pa. P.U.C.,* 154 Pa. Superior Ct. 272, 35 A. 2d 584 (1944). As we noted in

*Delaware River Port Auth. v. Pa. P.U.C.*, supra, §411, empowering the Commission to allocate costs in a highway-rail crossing situation, must be read in connection with §409. Section 409(a) defines the crossings with respect to which the Commission can assess certain costs under §411. Such crossings are those which involve the facilities of "a Public Utility engaged in the transportation of passengers or property", i.e., a railroad or railway. The transportation utilities *concerned* for purposes of assessment under §411 are those whose facilities are constructed or located at such crossing. The fact that the Port Authority has no railway facilities located at Black's Bridge crossing is clearly established by the evidence in this case and is not seriously disputed.

The evidence shows that the Commission, by an Order of January 16, 1961, approved the application of Railways "for abandonment of street railway services and facilities on its West End system of street railway routes" which included Black's Bridge and the railway facilities associated therewith. The Authority, pursuant to the provisions of the Port Authority Act, §7.1 acquired by condemnation Railways' "transportation system", which is defined by §2(13) of the Act to mean "all property, real and personal, useful for the transportation of passengers for hire, . . .". This definition of a transportation system cannot in any manner be construed to include abandoned bridges and railway facilities. Whatever the provisions of the Authority's condemnation resolution may be, such resolution cannot condemn any more than the Port Authority Act permits it to condemn. However, as to the intent and effect of such condemnation resolution, the stipulation of Railways and the Authority made in connection with this case is significant. These parties stipulated "that neither Black's Bridge nor the street railway facilities thereon are included in the Pitts-

burgh Railways Company's inventory presented and introduced into evidence by the Pittsburgh Railways Company in the condemnation proceedings before the Board of Viewers in the Court of Common Pleas of Allegheny County at 2580 April Term, 1964, which inventory Pittsburgh Railways Company contends represents the physical property of the Pittsburgh Railways Company which it contends was condemned by the Port Authority." The Port Authority, accordingly, did not and could not acquire Black's Bridge or Railways' abandoned railway facilities associated therewith. The Authority, not having a rail facility situated at the Black's Bridge crossing, can have no *concern* with such crossing within the meaning of §411 of the Public Utility Law.

To impose liability upon the Authority, an agency of the Commonwealth, in the case of a crossing where it has no rail facilities, completely contravenes the principle set out by this court in *Delaware River Port Auth. v. Pa. P.U.C.,* supra, wherein we stated at page 648: "The general rule has always been that the Commonwealth or its agency cannot be required to bear costs of relocating facilities of any public utility. The only exception to this rule is that imposed by the Legislature in Section 411: that the Commonwealth may, in the discretion of the Commission, be required to pay the relocation costs of the facilities of a transportation public utility (as described in §409) and *only* then when such costs have been expended in the construction, relocation, alteration, protection or abolition of a highway-rail crossing accomplished under the procedure prescribed in §409." (Emphasis in original)

In *Delaware River Port Auth.,* supra, we refused to allow the costs of relocating a non-transportation utility to be imposed upon the Delaware River Port Authority since §§409-412, inclusive, of the Public Utility Law did not expressly authorize such an as-

sessment against any agency of the Commonwealth. In this case, we must similarly deny the Commission the right to impose an assessment against the Port Authority, also an agency of the Commonwealth, there being no statutory authority requiring it to bear any of the costs relating to the construction, relocation, protection or abolition of a crossing where none of its facilities are involved.

The Superior Court justifies the imposition of liability on the Authority by its finding that the Authority, after the condemnation of Railways' transportation system, continued to operate Railways' bus routes 27 and 28. Those routes, as certificated by the Commission, traversed Black's Bridge. However, at the time of the Authority's condemnation of Railways' transportation system, they were being detoured around the Bridge because of weight restrictions thereon. The Superior Court stated that the evidence clearly showed "that the Authority took over Routes 27 and 28 subject to further orders of the commission as to the Black's Bridge crossing".

As we have said before, the extent of the Commission's authority to assess costs in connection with the construction, relocation, alteration, protection or abolition of a rail-highway crossing must be found within §§409-412, inclusive, of the Public Utility Law. We find nothing therein imposing liability upon a public authority which, after acquiring a privately-owned transportation system, continues to follow the same bus routes formerly followed by the privately-owned utility. The Authority's right to operate over these two routes was neither derived from nor dependent upon the certificates of public convenience relating thereto which had been issued by the Commission to Railways. The right of the Authority to operate over these routes or over any other public road, street, way, highway, bridge or tunnel, was expressly granted to

it by §3(b) of the Port Authority Act. The same Section also placed in the Port Authority the exclusive right to determine by itself the facilities to be operated by it and the services to be available to the public.[1] Section 13.1 of the Port Authority Act expressly provides that the Authority shall have exclusive jurisdiction with respect to all matters regarding a transportation system within its service area and that the Commission "shall have no authority to grant certificates of public convenience for a transportation system or otherwise regulate in any respect within the said service area."

These independent grants of power by the General Assembly to the Authority show conclusively that the Authority did not submit itself to the further orders of the Commission as to the Black's Bridge crossing by having followed Railways' former Routes 27 and 28. Since the Authority had the power to elect to follow any routes it chose, such action by it in this case cannot be construed as a submission to the assessment powers of the Commission in connection with Black's Bridge. In any event, since the Port Authority admittedly does not have a rail facility situated at the Black's Bridge crossing, it cannot be assessed for any of the costs connected with Black's Bridge, whether or not it may now or hereafter operate busses over that Bridge.

The Commission has argued in this case that the Authority's mere act of acquiring and operating Railways' transportation system imposes upon it transferee liability for the obligations of Railways in connection with Black's Bridge. An examination of the Port

---

[1] This exclusive right is limited only to the extent that the Authority's determination is subject to review by the Court of Common Pleas of Allegheny County to determine "the reasonableness of fares, rates and other charges and services fixed, altered, charged or collected" by the Authority.

Authority Act shows, beyond question, that the Authority, in acquiring Railways' transportation system by condemnation did not thereby assume any obligations of Railways with respect to the Black's Bridge crossing. Nowhere in the Act are there provisions imposing such liability upon the Authority. In this regard, it should be noted that the Authority did not acquire the Railways Company including its liabilities, but merely acquired specific properties of Railways as described in §2(13) of the Port Authority Act.

When the General Assembly intended that the Authority should assume an obligation of any of the transportation systems acquired by it, such intent was made abundantly clear. This is shown by §13.2 of the Port Authority Act, where it is stated that "The [Port] authority shall assume the obligations of any transportation system acquired by it with regard to wages, salaries, hours, working conditions, sick leave, health and welfare and pension or retirement provisions for employes." If the General Assembly had intended that the Authority should assume any other obligations of a transportation system acquired by it, it is reasonable to conclude that it would have expressed such intent just as clearly as it did in the foregoing provision relating to wages, salaries and working conditions.

An examination of the Public Utility Law reveals no provision which can be construed as placing any transferee liability upon the Authority for the obligations of the transportation systems acquired by it in connection with highway-rail crossings.

We agree with the statement of the Superior Court in its earlier consideration of this case that "It is difficult to see how the acquisition of the 'transportation system' and bulk of assets of Railways by the Authority, could impose liability on the Authority for any part of the crossing alteration and construction cost, in this proceeding involving only Black's Bridge.

Liability must be determined upon some sound legal or factual basis, and cannot be predicated upon general commission policy [citing a case]." *Allegheny Co. Auth. v. Pa. P.U.C.*, supra, at page 310.

In view of our conclusion that the Commission lacked the statutory authority to make the order appealed from, it is not necessary to discuss the Constitutional issues raised by the Authority. Further, we do not find it necessary to determine upon whom the maintenance costs of Black's Bridge should be imposed. Suffice it to say that they may not be imposed upon the Authority.

The order of the Superior Court is reversed, and the record is remanded to the Commission for further proceedings, not inconsistent with the views expressed herein.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I agree with the majority that, although the Commission has the statutory authority to allocate costs of maintenance or reconstruction of "Black's Bridge" crossing, it can do so as to the Port Authority only if that body is concerned with the particular highway-rail crossing in issue. I further agree that the Authority is not *at this moment* a concerned party and thus reject, primarily because of the discretion given to the Authority to choose its routes, any theory that the Authority has assumed a type of transferee liability.

However, in my view, this should not end our inquiry. The majority has failed to appreciate the unique situation confronting this Court. As disclosed by the opinion of the Superior Court presently under review, *Allegheny County Port Authority v. Pennsylvania Public Utility Commission*, 210 Pa. Superior Ct. 1, 232 A. 2d 54 (1967), Railways was permitted by the Commis-

sion in 1961 to discontinue* its street railway routes over Black's Bridge and substitute buses thereon. Railways then operated buses over this bridge until 1963 when bus service was halted because of Commission imposed weight restrictions. Throughout this period it is evident that all concerned contemplated that Black's Bridge would be rebuilt so that it would no longer constitute a safety hazard and that the reconstruction costs would be shared by Railways. The Authority then acquired Railways, upsetting these expectations. Certainly, if the Authority has no plans to operate transportation facilities over Black's Bridge, it is not concerned with either the costs of maintenance or reconstruction. But just as certainly, the Authority should not be permitted to disclaim all responsibility for maintenance and reconstruction if, the very day or soon thereafter Black's Bridge is declared again fit for bus or rail service, it immediately begins to utilize the bridge. Yet this is what the majority opinion contemplates; and the logical consequence of the great emphasis the majority places upon the Authority's discretion as to routes is to create a situation where the Authority, with knowledge that the Commission contemplates assessment of costs of construction or reconstruction of a crossing being used by the Authority, could, relying on its discretion as to routes, discontinue service over the crossing to be assessed and then reinstate this very service after the improvements have been completed, all without contributing to the costs involved. I can find no legislative sanction in the act creating the Port Authority to permit such a blatant escape of costs which the Authority should bear.

---

* I do not believe, as did the Superior Court, that characterizing Railways' 1961 action pursuant to Commission order as either a conditional or unconditional abandonment of Black's Bridge is helpful.

576

The missing factor, therefore, is the Authority's intention as to future use of Black's Bridge as reconstructed, an intention upon which we should not speculate. However, although the Commission may not *now* assess the Authority for maintenance of Black's Bridge, the majority opinion also precludes any future assessment for reconstruction costs even if the Authority begins use of the bridge immediately upon the completion of renovation. I believe that the Commission's discretionary power to allocate costs among the parties concerned is broad enough, see *Allegheny County Port Authority v. Pennsylvania Public Utility Commission*, 207 Pa. Superior Ct. 299, 217 A. 2d 810 (1966); *Pittsburgh Railways Company v. Pennsylvania Public Utility Commission*, 198 Pa. Superior Ct. 415, 424-25, 182 A. 2d 80, 84 (1962), to permit it, in light of the Authority's possible future use of Black's Bridge, to assess, based upon this use, reconstruction costs against the Authority. I therefore dissent to that part of the majority opinion absolving the Authority from any future liability for reconstruction costs.